[Cite as *Schmidt v. Schmidt*, 2012-Ohio-5252.]

STATE OF OHIO, MONROE COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT

| | | |
|---|---|---|
| RICHARD SCHMIDT, | ) | CASE NO.    11 MO 6 |
| | ) | |
| PLAINTIFF-APPELLEE, | ) | |
| | ) | |
| VS. | ) | O P I N I O N |
| | ) | |
| MARENA SCHMIDT, | ) | |
| | ) | |
| DEFENDANT-APPELLANT. | ) | |

CHARACTER OF PROCEEDINGS:           Civil Appeal from Common Pleas Court,
                                                            Case No. 2010-312.


JUDGMENT:                                       Affirmed.


APPEARANCES:
For Plaintiff-Appellee:                        Attorney Rebecca Bench
                                                           23 Driggs Lane
                                                           Bridgeport, Ohio  43912



For Defendant-Appellant:                   Attorney Mark Morrison
                                                           117 North Main Street
                                                           Woodsfield, Ohio  43793



JUDGES:
Hon. Joseph J. Vukovich
Hon. Cheryl L. Waite
Hon. Mary DeGenaro


                                                           Dated: November 6, 2012

VUKOVICH, J.

{¶1} Appellant Marena Schmidt appeals the decision of the Monroe County Common Pleas Court, which terminated the alternating residential parent status regarding one of the parties' three children and named appellee Richard Schmidt the residential parent of that child. The threshold issue is whether the statutory changed circumstances provisions applicable to the modification of parental rights and responsibilities apply here where there is a separate statute applicable to the termination of a shared parenting decree which only requires the court to consider whether termination is within the child's best interests. Since the trial court here did not state that the prior shared parenting decree was terminated when it modified the parties' residential parent status and certain portions of the prior decree still exist, we agree with the mother that changed circumstances were required.

{¶2} As to the trial court's finding of changed circumstances, the mother argues that a nine-year-old's wishes are not a sufficient changed circumstance to justify naming the father as residential parent. However, the trial court heard this child declare his wishes and concerns in chambers and could find them sincere, serious, and worthy of respect under the circumstances of the case. In addition, other changed circumstances involve the mother's multiple moves since the decree, the mother's untimely adoption revelations without the participation of the father, the child's emotional turmoil and attachment to the father, and the relationship issues between the mother and child. Thus, a finding of changed circumstances is not unreasonable.

{¶3} The modification of custody statute has two other requirements, which are not specifically raised as errors by the mother. Still, our review shows that it was not unreasonable for the trial court to find that the modification was in the child's best interests and that the harm likely to be caused by the change or environment was outweighed by the benefits of the change. The trial court's decision is upheld.

STATEMENT OF THE CASE

{¶4} The parties began dating while the mother was pregnant with someone else's child. The mother gave birth to that child in the spring of 2002, and the parties

were married in the fall of that year. The husband acted as the child's father and legally adopted him at age five. (Tr. 139). The parties had two other children in 2003 and 2008.

{¶5} In September of 2010, the parties petitioned the court for a dissolution and filed a joint shared parenting plan providing that the children would alternate weeks with the parties and that each party would be the residential parent while they had the children. The agreement stated that the mother's residence shall be considered the children's primary residence for school purposes as long as the children remain enrolled in either Hannibal Elementary School or River High School. It continued to state that if the mother's residence changes so that the children are no longer able to remain enrolled in either school, then the father's residence shall be deemed the primary residence for school purposes if his residence allows the children to be enrolled in those schools. On December 15, 2010, the trial court entered a decree of dissolution and incorporated the shared parenting plan in its decree.

{¶6} Six weeks later, the mother filed a motion to modify the court's order regarding the children's residence for school purposes. She stated that she moved from Hannibal and that she was relocating to Neffs, Ohio in Belmont County. She stated that although the shared parenting plan provided that the father's residence would be primary for school purposes if she moved from the district, she wanted to remain residential parent for school purposes so the children could go to "Belmont County Schools" in the 2011-2012 school year. She also asked to change the custody from shared to full custody because the children need stability and she works a regular schedule whereas the father works swing shifts.

{¶7} The father responded with a memorandum in opposition. As for the other two youngest children, the father expressed that shared parenting remained in their best interests as they enjoyed spending alternate weeks with each parent. Regarding the oldest child, who was about to turn nine, the father filed a motion to terminate the shared parenting plan and to modify custody. He disclosed that the mother moved in with her boyfriend, which resulted in chaos for all of the children. She then announced to the oldest child that her new boyfriend was his biological

father. This announcement resulted in a particularly emotional situation for this child, especially since the child had never been informed that he had been adopted and since the mother made this revelation without the participation of the adoptive father.

{¶8} The father's motion asked the court to interview the oldest child to ascertain that it is in his best interests to terminate shared parenting and to live full-time with him. The court interviewed the oldest child in chambers. The parties then came to a temporary agreement for the summer, allowing the child to primarily stay with the father. The case was heard in August of 2011.

{¶9} The counselor for the two older children, who was employed by the mother, testified that the child has been having problems in his relationship with his mother and the child is very close to his father. (Tr. 9, 11). He said the child wants to live with his father, acknowledging that the father has likely attempted to influence the child's decision. (Tr. 13-14). It was suggested that the mother should have consulted with the counselor and the current father prior to announcing to the child that he had been adopted and that he was now living with his biological father. (Tr. 18-19, 23). The counselor described this event as a "psychological bombshell" for which all parties should have been present. (Tr. 19, 21). He noted that the child immediately asked to schedule a visit with him after the announcement. (Tr. 21).

{¶10} The counselor testified that the child likes his school and has a good relationship with his classmates. (Tr. 25). He noted that the child was currently playing football, which he loved. He described school and sports as being a large part of the child's life. (Tr. 26).

{¶11} The counselor would not provide a recommendation as to custody but merely stated that both parents need to discontinue their "game playing" and to be more cooperative. (Tr. 33, 44). He gave an example of the father's family planning an event during the mother's week while she was at work, the mother stating that they could only have the children if she got a day during the father's week, and the father disagreeing so the children ended up not being able to attend the event. (Tr. 36, 41, 54). It was also noted that the mother registered the child for baseball in the league within her school district while the father registered the child for the league within the children's school district. (Tr. 41).

**{¶12}** The mother testified that the children should remain together. (Tr. 47). She complained that the father often has his parents or her grandparents babysit. (Tr. 48). She opined that the father does not have the children bathe often enough, that he does not have a set routine, and that he lets them stay up too late. (Tr. 49-50, 52). She stated that he has transported the three-year-old without a car seat. (Tr. 51). She also noted that the father's house is in foreclosure. (Tr. 50).

**{¶13}** At the time of the dissolution, the mother lived in Hannibal (Monroe County), which was where she agreed the children would attend school and which was near her work across the river in New Martinsville, West Virginia. In December, just after the decree, she moved nearly an hour away to Neffs, Ohio (Belmont County) with her former boyfriend (the oldest child's biological father). (Tr. 63). When that relationship appeared unsuitable for her children, she moved to Bellaire. (Tr. 68-69). Then, in May, she moved to Shadyside, which is more than thirty minutes from Hannibal. (Tr. 67).

**{¶14}** She testified that she lived within walking distance of the Shadyside schools and opined that it was a better district because it had more students. (Tr. 55-56). She did not look into the academic ratings of the new district, and she did not know if the oldest child could still play football that season or if the middle child could cheer there. (Tr. 77). When asked why she agreed with the provision regarding the school district in the shared parenting plan, she stated that her lawyer knew that she was uncomfortable with that provision. (Tr. 65-66).

**{¶15}** It was developed that the mother could pass through Hannibal on her drive to work in New Martinsville, West Virginia every weekday. (Tr. 77). It was established that the oldest child, who was nine and will be in fourth grade, has attended the same school since kindergarten. He receives As and Bs, he has friends there, and he plays football, basketball, and baseball, which are a big part of his life. The middle child, who was almost eight and entering second grade, has also attended since kindergarten. She was involved in basketball, softball, and cheerleading and also has many friends. (Tr. 75-76, 123). After the presentation of this information, the mother voiced that children can make friends and play sports anywhere. (Tr. 74).

{¶16} The mother's step-mother, who lives nearly an hour away, testified that her teenager babysits the children during the summer while the mother works. (Tr. 91, 99, 101). She complained that the father sends the children home dirty and that he allows them to eat junk food. (Tr. 92). She testified that the middle child misses the oldest child since he has been staying with their father. (Tr. 95). The mother's friend also testified that the mother is a good parent. (Tr. 114-115).

{¶17} The maternal great-grandfather testified that he lives in Monroe County, that he and the maternal great-grandmother have helped babysit the children since they were born, and that they love watching the children, eschewing any suggestion that the father was imposing upon them. (Tr. 105). He opined that he is satisfied with the current arrangement whereby the oldest child primarily stays with his father and the younger children stay alternate weeks with the parents. (Tr. 106, 108). He explained that the mother's relationship with the children was poor until recently, noting that she had been acting selfish. (Tr. 107). He stated that the oldest child has really bonded with the father. (Tr. 106). He disputed testimony that the father keeps the children in a dirty condition. (Tr. 107).

{¶18} The father testified as to how upset the oldest child was when the mother informed the child he had been adopted by the father and expressed that it was a harmful time to tell him. (Tr. 134, 137). He stated that the event brought the child even closer to him. (Tr. 136). He opined that the oldest child is unhappy when he is staying with his mother unlike the other two children who are happy during their week with their mother. He testified that the oldest child has been more cooperative about going with his mother since the temporary agreement allowed him to stay with the father most of the time as the child knows he will be back soon. (Tr. 142-143). The father explained that this child wanted to live with him prior to the dissolution but he had encouraged him to give the alternate week arrangement a chance. (Tr. 145, 153).

{¶19} The father also testified that he and the oldest child love the outdoors; they fish together and watch baseball games. (Tr. 137). He confirmed that the two older children have many friends and that it would be especially stressful on the older child to switch school districts. (Tr. 128). The father coaches the oldest child in

football, basketball, and baseball. (Tr. 123). He also coaches the middle child in softball and basketball. (Tr. 124). His mother is a cook at the school. (Tr. 127). He testified that his parents, his aunt, his uncle, and her grandparents live near him. (Tr. 133). He noted that he previously picked the children up at school for the mother and kept them until she got off work on her weeks. (Tr. 130). He testified that he cooks, that he has the children bathe every other night, and that he only forgot the car seat on one occasion. (Tr. 147-148, 149-150).

**{¶20}** The father testified that his house had just entered the foreclosure process two weeks ago, pointing out that he was behind because the mother was behind when he moved in and that their agreement states that she owes him $8,000 on the house. (Tr. 120, 167). He states that he is trying to keep the house, but if the foreclosure eventually occurs, he will temporarily move into a three-bedroom mobile home belonging to his mother that is located behind the school in the district as agreed in the shared parenting plan. (Tr. 119, 152). He stated that his girlfriend lives with him and that her young children stay with them Monday through Thursday. (Tr. 151).

**{¶21}** On August 23, 2011, the court denied the mother's motion and ordered that, pursuant to the shared parenting plan, the children's residential address for school purposes would change to the father since the mother moved out of the school district and the father still lives in the district. Besides implementing this previously agreed-upon modification, the court left the parenting arrangement for the two youngest children unchanged.

**{¶22}** As for oldest child, however, the court named the father as the residential parent with whom the child would primarily reside, named the mother the non-residential parent, and granted the mother standard visitation. In doing so, the court found changed circumstances in the child's expressed desire to live with his father and noted that the mother relocated multiple times and did not live in the agreed school district. The court found that its new order was in the child's best interest, listing various facts and considerations.

**{¶23}** The mother filed a timely notice of appeal. Notably, the mother does not contest the court's decision denying her motion or the court's decision in

changing the school residence designation as agreed in the shared parenting plan. Her sole assignment of error revolves around whether or not there were sufficient changed circumstances in this case to name the father the sole residential parent of the oldest child. The father initially responds that changed circumstances are not required here. Thus, we begin with this issue.

CUSTODY LAW

{¶24} When allocating parental rights and responsibilities in an original decree or in any proceeding for modification, the court shall consider the child's best interests. R.C. 3109.04(B)(1). To determine best interests, the court shall consider all relevant factors including: (a) the parents' wishes; (b) the child's wishes if the court has interviewed the child; (c) the child's interaction and interrelationship with the child's parents, siblings and any other person who may significantly affect the child's best interests; (d) the child's adjustment to home, school, and community; (e) the mental and physical health of all relevant persons; (f) the parent more likely to honor and facilitate court-approved parenting time rights or companionship rights; (g) whether either parent has failed to make all child support payments pursuant to a child support order; (h) whether either parent or any member of the household of either parent previously has been convicted of or pleaded guilty to certain criminal offenses involving children; (i) whether the residential parent or one of the parents subject to a shared parenting decree has continuously and willfully denied the other parent's right to parenting time in accordance with a court order; and (j) whether either parent has established a residence, or is planning to establish a residence, outside of Ohio. R.C. 3109.04(F)(1)(a)-(j). The allocation of parental rights and responsibilities deals with the designation of the residential parent and legal custodian to one parent or to both (as in many shared parenting decrees). *Fisher v. Hasenjager*, 116 Ohio St.3d 53, 2007-Ohio-5589, 876 N.E.2d 542, ¶ 23-25.

{¶25} Once the allocation has been performed, division (E)(1)(a) then provides that the court shall not modify a prior decree allocating parental rights and responsibilities for the care of a child unless it finds, based upon facts that have arisen since the prior decree or that were unknown to the court at the time of the prior decree, that a change has occurred in the circumstances of the child, the child's

residential parent, or either of the parents subject to a shared parenting decree and the modification is necessary to serve the child's best interests.

**{¶26}** This division continues to state that the court shall retain the residential parent designated by the prior decree or the prior shared parenting decree unless modification is in the best interests of the child and one of the following applies: (i) the residential parent agrees to a change or both parents under shared parenting decree agree to a change in designation of the residential parent; (ii) the child, with the consent of the residential parent or both parents under a shared parenting decree, has been integrated into the family of the person seeking to become residential parent; or (iii) the harm likely to be caused by a change of environment is outweighed by the advantages of the change of environment to the child. R.C. 3109.04(E)(1)(a).

**{¶27}** In addition to a modification authorized under (E)(1)(a), there are three other types of changes relevant to a shared parenting decree. For instance, the parties may jointly modify the terms of a shared parenting plan unless the court finds the modification is not in the child's best interests. R.C. 3109.04(E)(2)(a). In addition, the court may modify the terms of the plan for shared parenting on its own motion at any time or upon request of one or both parents if the court determines the modification is in the child's best interests. R.C. 3109.04(E)(2)(b).

**{¶28}** Finally, the court may terminate a prior final shared parenting decree that included a shared parenting plan such as the one at issue here upon the request of one or both parents or *whenever it determines that shared parenting is not in the child's best interests.* R.C. 3109.04(E)(2)(c). Upon the termination of a prior final shared parenting decree under (E)(2)(c), *the court shall proceed* and issue a modified decree for the allocation of parental rights and responsibilities for the care of the children under the standards applicable in divisions (A) through (C) *as if no decree for shared parenting had been granted* and as if no request for shared parenting had been made. R.C. 3109.04(E)(2)(d).

**{¶29}** The Supreme Court has decided a case where the parents equally shared parental rights and responsibilities under a shared parenting agreement adopted by the trial court and both later asked to be named sole residential parent

and legal custodian of the child. *Fisher v. Hasenjager*, 116 Ohio St.3d 53, 2007-Ohio-5589, 876 N.E.2d 542, ¶ 2. The trial court found that it was in the child's best interests to terminate the shared parenting plan and found it in the child's best interests for the mother to be designated the residential parent. *Id.* at ¶ 3. The Supreme Court found that the changed circumstances test of (E)(1)(a) applied in that case.

**{¶30}** To ascertain the effect of that holding, the appellate process of that case may be important. The appellate court in *Fisher* examined the four modification provisions in (E)(1)(a), (E)(2)(a), (E)(2)(b), and (E)(2)(c) outlined above. *Id.* at ¶ 5. The appellate court found that (E)(2)(a) was inapplicable because it was not a joint modification of the terms. The appellate court also concluded, that although the trial court stated that it "terminated" the shared parenting plan, the decision was actually a modification and was thus not subject to (E)(2)(c). *Id.* at ¶ 6. The appellate court then analyzed whether to apply the (E)(1)(a) changed circumstance test or the (E)(2)(b) best interests test. The appellate court concluded that the trial court was permitted to modify the shared parenting plan with respect to the residential parent and legal custodian of the child under (E)(2)(b) upon a mere finding of best interests. *Id.* at ¶ 9.

**{¶31}** The Supreme Court accepted the case as a discretionary appeal, and the following certified question was also presented: whether a change in the designation of residential parent and legal custodian of children is a modification of a "term" of a shared parenting decree, allowing the designation to be modified solely on a finding that the modification is in the best interest of the children pursuant to (E)(2)(b) and without a determination that a change in circumstances has occurred pursuant to (E)(1)(a). *Id.* at ¶ 1. Thus, the Supreme Court did not review the appellate court's decision that this was not a termination of the shared parenting plan under (E)(2)(c). Besides noting that the appellate court had found that this was not a termination under (E)(2)(c), the Supreme Court majority made no further mention of that section.

**{¶32}** The Court held that (E)(1)(a) controls when a court modifies an order designating the residential parent and legal custodian and this designation cannot be

modified under (E)(2)(b), which allows only for the modification of the terms of a shared parenting plan. *Id.* at ¶ 26 (emphasizing the difference between the order for allocation versus the plan containing mere "terms" of shared parenting). The Court stated that a modification of the terms of the plan mentioned in (E)(2)(b) would not encompass changing the order designating the residential parent but would apply to items such as the child's living arrangements, medical care, school placement, and child support. *Id.* at ¶ 30. The Court noted the various reasons for the higher standard for changing the residential parent designation. *Id.* at ¶ 32-36.

{¶33} A dissent urged that the case involved the termination of a shared parenting decree under (E)(2)(c). The dissent stated that the majority should not have relied on the appellate court's statement that the trial court's order was not a termination. *Id.* at ¶ 38. The dissent concluded that by failing to analyze that holding, the majority answered a question that did not need answered. *Id.* at ¶ 60.

{¶34} Thereafter, this court ruled on a case where the trial court granted the father's request to terminate shared parenting and to designate him the residential parent. *Surgenavic v. Surgenavic*, 7th Dist. No. 08MA29, 2009-Ohio-1028, ¶ 5. This court stated:

> Although Appellee requested "termination" of the shared parenting plan, R.C. 3109.04(E)(2)(c) is not applicable in this case. The Ohio Supreme Court, in *Fisher v. Hasenjager*, 116 Ohio St.3d 53, 2007-Ohio-5589, 876 N.E.2d 546, recently recognized that a shared parenting plan is not the vehicle by which a trial court designates a residential parent or legal custodian. Id., ¶ 31, 876 N.E.2d 546. Because the designation of the residential parent and legal custodian involves the allocation of parental rights and responsibilities, "R.C. 3109.04(E)(1)(a) controls when a court modifies an order designating the residential parent and legal custodian." Id., ¶ 26, 876 N.E.2d 546.

*Surgenavic,* 7th Dist. No. 08MA29 at ¶ 9.

{¶35} Thereafter, this court issued a non-unanimous decision regarding the effect of the Supreme Court's *Fisher* holding and our holding in *Surgenavic.* In

*Kougher*, the father sought termination of the shared parenting decree. *Kougher v. Kougher*, 194 Ohio App.3d 703, 2011-Ohio-3911, 957 N.E.2d 835. The trial court denied the motion, holding that the father failed to show changed circumstances. The father appealed, arguing that the changed circumstances test was not required under (E)(2)(c). We agreed, holding that *Fisher* only dealt with modification of parental rights under a shared parenting plan and did not involve the complete termination of shared parenting. *Id.* at ¶ 5. We noted that *Fisher* did not decide whether (E)(2)(c) had any bearing on (E)(2)(a). *Id.* at ¶ 15.

**{¶36}** We stated that the trial court misinterpreted our prior case of *Surgenavic.* We distinguished that case, stating that we applied *Fisher* there because it involved termination of a shared parenting plan, rather than a complete termination of shared parenting, which includes the termination of the shared parenting decree as well as the shared parenting plan. *Id.* at ¶ 18. We pointed to the statement in *Fisher* that there are differences between the shared parenting plan (which implements the specific day-to-day details of shared parenting) and the decree itself (the order granting shared-parenting rights or designating parental rights and responsibilities). *Id.* When the shared parenting decree is terminated, the court must start from scratch and create a completely new parenting order. *Id.*

**{¶37}** We then stated that the order the father was attempting to terminate in its entirety was, in all respects, a shared parenting decree incorporating a shared parenting plan. *Id.* at ¶ 22. We thus held that (E)(2)(c) was applicable. We noted that (E)(2)(c) requires only the best interests test to determine whether the court should "terminate a prior final shared parenting decree that includes a shared parenting plan * * *." *Id.* We then declared, "[t]his statutory subsection was not reviewed in the majority opinion of the Ohio Supreme Court's *Fisher* case, and we must allow the plain words of the statute to speak for themselves." *Id.* We concluded that *Fisher* does not require a finding of a change in circumstances when a party attempts to completely terminate a shared parenting decree under (E)(2)(c). *Id.* at ¶ 25.

**{¶38}** The *Kougher* dissent noted that *Fisher* required a change of circumstances under (E)(1)(a) whenever the residential parent and legal custodian is

changed, whether in a sole custody situation or a shared parenting situation. *Id.* at ¶ 49, 58 (DeGenaro, J., dissenting) (and also pointing out how *Fisher* listed the reasons why changed circumstances are important when reallocating parental rights and responsibilities). The dissent opined that termination of the plan pursuant to (E)(2)(c) presupposes that a change of circumstances has been found by the trial court under (E)(1)(a). *Id.* at ¶ 52.

**{¶39}** Without redeciding the controversy here, we conclude that the case before is distinguishable because the shared parenting decree here was not actually terminated. Firstly, the language of the trial court's order leaves some terms of the shared parenting plan in existence with regards to the oldest child.

**{¶40}** We recognize that the trial court did rule that the father shall be named the residential parent of the oldest child, the child shall primarily reside with his father, the mother shall be deemed the non-residential parent, and the mother shall be entitled to parenting time consistent with the court's standard order of visitation. This seems to suggest a termination of shared parenting.

**{¶41}** However, (E)(1)(a) speaks of allocation of parental rights and responsibilities upon a change in the circumstances of a residential parent *or either of the parents subject to a shared parenting decree.* R.C. 3109.04(E)(1)(a). *See also Fisher*, 116 Ohio St.3d 53 at ¶ 26 (allocation of parental rights and responsibilities means designation of residential parent and legal custodian).

**{¶42}** And, the trial court did not actually state that it was terminating the shared parenting decree. To the contrary, the court stated that all prior orders not specifically addressed shall remain unchanged. The prior order stated that the shared parenting plan was incorporated as if fully rewritten into the court's decree. Said plan provided that the mother shall be residential parent at all times that the father is not exercising his rights as residential parent and provided that the father was the residential parent every other week for one entire week. These provisions may have been eliminated by the court's new order naming the father as the primary residential parent, naming the mother non-residential parent, and imposing standard visitation for the mother.

**{¶43}** Yet, there were also other aspects of the plan. For instance, it stated each parent shall have reasonable access by telephone at all times. There is also a provision requiring consultation on non-emergency medical treatment, insurance coverage, schooling, day care, religion, and discipline. This provision supplied the parties with the right to mediation on these subjects if agreement cannot be reached. Furthermore, the shared parenting plan contains the allocation of the tax treatment of the children.

**{¶44}** Finally, the plan and decree clearly still exist regarding the other two children. In fact, the court enforced the plan's provision regarding the modification of the residential parent for school purposes due to the mother's move from the school district. Thus, we conclude under the unique circumstances existing herein, that the court's decision was not a termination under (E)(2)(c) but rather than a modification under (E)(1)(a) requiring changed circumstances.

<u>ASSIGNMENT OF ERROR</u>

**{¶45}** The mother's sole assignment of error provides:

**{¶46}** "IT IS PREJUDICIAL ERROR TO FIND THAT THE WISHES OF A NINE YEAR OLD CHILD ARE SUFFICIENT WITHOUT OTHER CHANGES OF CIRCUMSTANCES TO JUSTIFY A MODIFICATION OF RESIDENTIAL PARENT STATUS ONE MONTH AFTER THE ORIGINAL DECREE."

**{¶47}** In determining whether a change of circumstances has occurred, the Supreme Court has expressed that "custody issues are some of the most difficult and agonizing decisions a trial judge must make." *Davis v. Flickinger*, 77 Ohio St.3d 415, 418, 674 N.E.2d 1159 (1997). Thus, the trial court's decision must not be reversed absent an abuse of discretion. *Id.* The trial judge has the best opportunity to view the demeanor, attitude, and credibility of each witness, and this is even more crucial in a child custody case where there may be much evident in the parties' demeanor and attitude that does not translate to the record well. *Id.* at 418-419. "There must be a change of circumstances to warrant a change of custody, and the change must be a change of substance, not a slight or inconsequential change." *Id.* at 418. However, the change need not be "substantial." *Id.* at 417-418.

{¶48} The mother states that a nine-year-old's wishes are not a sufficient changed circumstance. She also asks how there can be changed circumstances so soon after the original decree. As to the mother's complaint about the short amount of time that had passed since the prior decree, she was the party who, six weeks after the shared parenting decree was issued, filed a motion to ignore the school district provision and to terminate shared custody on grounds of a need for stability. A month after that, the father responded in opposition and filed his own motion to terminate shared parenting with regards to the oldest child. Thus, the timing cannot be held against the father.

{¶49} In determining changed circumstances, the trial court can consider both post-decree events and facts unknown to the court at the time of the prior decree. R.C. 3109.04(E)(1)(a). The father testified that the oldest child wished to live with him even before the shared parenting decree was entered. This fact was unknown to the trial court. In addition, post-decree events occurred contributing to the weight of the changed circumstances.

{¶50} For instance, the mother moved three times since the decree (all into different school districts), and she changed her mind about which school district the children should attend three times in a matter of months. Furthermore, the mother released a "psychological bombshell" on the oldest child, who was already having troubles with the situation, when she moved in with her former boyfriend and announced without the father's assistance that her boyfriend is the child's biological father. This worsened the child's already suffering relationship with his mother.

{¶51} The mother points out that Ohio abolished a child's right to elect where they wish to live and even then, this child would have been too young to have his choice binding. *See* Former R.C. 3109.04(A) (permitting a child of twelve to elect the residential parent). However, the court here did not proceed as if it was bound by the child's election. Upon the father's request, the court conducted an in camera interview with the child as required by R.C. 3109.04(B)(1). The court was thereafter permitted to determine the child's wishes and concerns. R.C. 3109.04(B)(2)(a). The court can then attribute the weight it desires to the child's wishes. As the court pointed out, the child had expressed his wishes to both of his parents. The child had

also advised his counselor of his wishes, and the mother's grandfather was aware of those wishes.

**{¶52}** The mother also complains that the father manipulated the child's feelings. However, the trial court was in the best position to evaluate whether the father was honest or manipulative and whether the child's wishes arose from his own true needs and desires or those of his father.

**{¶53}** In conclusion, the child's wishes were not slight or inconsequential. The trial court could find that this child's wishes were strong and serious based upon various issues including those involving the mother's recent actions. The mother agreed to a summer schedule to accommodate the child's wishes to primarily reside with the father, at least temporarily, and this agreement eased the child's emotional issues during transfer to his mother. Furthermore, the court had additional evidence before it such as the multiple moves (into various school districts), which the court did point to in its entry dealing with changed circumstances, and the mother's treatment of the adoption issue, which was encompassed in the child's wishes as it firmed up the child's desire.

**{¶54}** Considering the entire record, the trial court could reasonably find changed circumstance that were of substance and that represented more than a slight or inconsequential change. *See Davis*, 77 Ohio St.3d at 418. *See also Wallace v. Willoughby*, 3d Dist. No. 17-10-15, 2011-Ohio-3008 (trial court did not abuse its discretion in finding changed circumstances where eleven-year-old expressed great desire to reside with father, his desire was so strong that mother allowed child to live with father for three months, children were enrolled in three different schools within a span of nine months, and mother relocated with children 30 miles from place they had lived their entire lives).

**{¶55}** The text of the mother's assignment of error only argues that the child's wishes did not constitute sufficient changed circumstances. It does not claim that the decision was faulty for any other reason. Although she later cites the other two statutory requirements for changing the allocation of parental rights and responsibilities, she does not clearly set forth arguments thereon. Still, our analysis will proceed with the remainder of the test for changing custody, beginning with the

child's best interests as the factors analyzed under this element assist in evaluating harm versus advantages, the third element.

{¶56} Each parent wanted to terminate shared parenting and be named residential parent. *See* R.C. 3109.04(F)(1)(a) (wishes of the child's parents). The child's wishes were ascertained through an in camera interview. *See* R.C. 3109.04(F)(1)(b). The child had a good and very close relationship with his father and a troubled relationship with his mother. *See* R.C. 3109.04(F)(1)(c) (interaction and interrelationship with parents, siblings, and others who significantly affect best interests). The child has a loving relationship with his maternal great-grandparents, which the father encourages. *See id.* The child has a sibling who is less than two years younger than him and a sibling who is six years younger than him. *See id.*

{¶57} Although the child would not be on the exact schedule as his younger siblings, he would still be with them regularly as the father has custody of the younger children every other week for the whole week and the mother will have visitation with him according to standard visitation, which will often include times when she has the other children. The child has many friends in the school district where his father lives, and his grandmother works in the school. The child's paternal grandparents live nearby, as do his maternal great-grandparents and a paternal aunt and uncle.

{¶58} Along these lines, the child is in fourth grade and has attended this school district since kindergarten. The mother states that a child of this age is resilient and can make friends and play sports elsewhere. However, the child plays at least three sports that are coached by the father, which would likely not continue should he reside solely with his mother and attend her school district.

{¶59} The child's emotional state is a concern: his counselor expressed that the divorce and the revelation of his parentage affected him, and his mother's grandfather expressed that his mother's actions after the divorce affected his relationship with her negatively. *See* R.C. 3109.04(F)(1)(e) (mental and physical health). And, a trier of fact can acknowledge that a child having issues such as those described to the court (after a recent divorce and a jarring revelation of parentage) can find much comfort in familiar surroundings and a familiar school. *See* R.C. 3109.04(F)(1)(d) (child's adjustment to home, school, and community).

{¶60} Even if neither parent has cooperated well with accommodating requests for switching days, both parents have honored the court-ordered visitation rights and there is no indication that either is unlikely to facilitate future court-ordered rights. See R.C. 3109.04(F)(1)(f) (parent more likely to honor and facilitate court-ordered visitation), (i) (whether one parent has continuously or willfully denied the other his or her right to court-ordered visitation).

{¶61} Regarding child support arrearages, the father was current. The mother indicated that he was behind a few weeks prior to the final modification hearing; however, he explained that this was a worker's compensation issue and that the child support agency advised him that he could pay at the end of the two-week compensation check rather than before he received it. See R.C. 3109.04(F)(1)(g). Neither parent had been convicted of any of the listed criminal offenses. See R.C. 3109.04(F)(1)(h). Neither parent appears to be planning a residence out of the state. See R.C. 3109.04(F)(1)(j). We do note here though that the mother's residential status has been unstable, and she works in West Virginia.

{¶62} The mother complains that the children are often left with her grandparents while the father has custody. However, the mother's grandfather testified that he and the mother's grandmother love the children and they want to babysit whenever they can. He dispelled any notions that the father is imposing upon them. He also revealed that he has been babysitting since the children were born; thus, it is not a new situation that the father is creating, but one started by the mother. The trial court could conclude that this shows that the father has the best interests of the children in mind by allowing her relatives to participate in the children's lives even when it is his time with the children. The mother's grandfather not only testified that his granddaughter caused her relationship with the children to suffer, he also opined that the oldest child would be better served if remained primarily with the father as he had over the summer.

{¶63} For all of these reasons, we conclude that the trial court did not abuse its discretion in finding that the modification served the child's best interests in order to satisfy the second part of the test for changing custody.

{¶64} The remaining part of the statutory test for changing the allocation of parental rights and responsibilities provides that the court shall retain the residential parent designated by the prior decree or the prior shared parenting decree unless: (i) both parents in shared parenting decree agree to a change in the residential parent; (ii) the child, with the consent of both parents to a shared parenting decree, has been integrated into the family seeking to become the residential parent; or (iii) the harm likely to be caused by a change of environment is outweighed by the advantages of the change in environment to the child. R.C. 3109.04(E)(1)(a)(iii).

{¶65} Here, both parents agreed to terminate the plan and change the residential parent. Still, they did not agree who should be named residential parent. The child could be said to have been integrated into the father's household with the mother's consent as he primarily lived there over the summer pursuant to an agreement based upon his desire to live with his father. Still, this was a temporary agreement pending the hearing on the opposing motions.

{¶66} As for the final option, the trial court found that pulling the child out of his established environment and community that he cherishes would dramatically harm him and that the harm that would result by changing his environment and trying to integrate him into a different environment is outweighed by any advantages of such a change. The court specified that there would be no advantages by naming the mother the residential parent. These were opinions within the trial court's broad discretion.

{¶67} Even if the child had not been living with the father during the summer, it is not unreasonable to find that, under all of the circumstances of this case, any harm to the child in changing his environment is outweighed by the advantages of the change. In any event, as aforementioned, the mother does not make specific arguments regarding this finding and does not point to any harm to the child by changing his environment from spending one week every other week with his mother to spending standard visitation with his mother.

{¶68} The closest argument she makes is in the conclusion to the brief where she states that the child would not be seriously harmed by moving in with her and attending her school district because children this age are resilient. However, the

court interviewed this specific child, evaluated his emotional situation from this interview and the testimony of his counselor and others, and found his wishes to be meritorious. It was the trial court's position to determine whether the child would be as resilient as his mother generally believed all children were and to evaluate whether the harm the child would suffer while attempting to become resilient should be avoided.

{¶69} For all of the foregoing reasons, this assignment of error is overruled, and the judgment of the trial court is hereby affirmed.

Waite, P.J., concurs.
DeGenaro, J., concurs.